Dean BUCHANAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 42638.

Court of Criminal Appeals of Texas.

April 8, 1970.

Rehearing Denied May 27, 1970.

---

**480**

Jake C. Cook, Fort Worth, court-appointed, for appellant.

Frank Coffey, Dist. Atty., and Truman Power, Ronald. W. Quillin, George McManus and William A. Knapp, Asst. Dist. Attys., Fort Worth, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

BELCHER, Judge.

The offense is murder with malice; the punishment, 75 years.

In his second ground of error the appellant contends that the trial court erred in not granting his motion to quash the indictment in that the Criminal District Court into which the indictment was returned did not have jurisdiction over him for the reason that he was at that time a sixteen-year-old juvenile.

After the Juvenile Court acquired jurisdiction by the filing of the delinquency petition on March 11, 1968, alleging that the appellant was a delinquent child, it held a full hearing on the state's request to waive jurisdiction, and then entered an order waiving jurisdiction and transferred the case to the Criminal District Court. Thereafter, the appellant was indicted by the grand jury of Tarrant County for murder. This offense was the basis of the delinquency petition. In re Buchanan, Tex.Civ.App., 433 S.W.2d 787, n. r. e.

■ Even though the appellant was sixteen years of age when the indictment was returned by the grand jury, this would not invalidate the indictment for the reason that all the statutory procedural requirements had been complied with before and upon the transfer of his case from the Juvenile Court prior to return of the indictment. Slaton v. State, Tex.Cr.App., 418 S.W.2d 502. The trial in the Criminal District Court in this case was after the appellant was seventeen years of age. The second ground of error is overruled.

The appellant challenges the sufficiency of the evidence to sustain the conviction.

Shortly after midnight on March 8, 1968, A. L. Simmons, night clerk at the Y. M. C. A., saw the appellant and two other males, who were all living at the Y. M. C. A., come into the lobby and ask about a cab. When they started to telephone for a taxi, a Yellow cab appeared across the street near a drug store on Jones Street. Simmons saw one of them go toward a cab.

Maudie Hudson testified that she and a man known to her only as John entered a Yellow cab around midnight March 8–9, 1968, and when it stopped on Jones Street, John left the cab, and a male person who looked like the appellant entered the front seat of the cab. Hudson left the cab at 1415 East Peach Street leaving the passenger who looked like the appellant in the cab.

A Yellow cab, number 33, was found about 3 a. m., March 9, 1968, one block from the Y. M. C. A., empty except for a taxi driver's cap, a trip sheet, street guide, a flash light, and a lead slug on the dash in front of the steering wheel and against the windshield.

T. E. Pilcher, an employee of the cab company, saw the deceased, Austin Greer, driving cab number 33 about 11:30 p. m., March 8, 1968, and next saw it at 3 or 4 a. m., March 9, on a street where it had been apparently abandoned. The last entry on the trip sheet found in the cab was for a trip ending at 12:25 a. m., March 9, at 1415 East Peach Street. When found, the cab meter showed $1.85 for a trip which had not been entered on the trip sheet.

The body of Austin Greer, the driver of the Yellow cab, number 33, was found around noon March 9, on a vacant lot. There were car tracks beside the body.

In checking the last address listed on the trip sheet, Officers Powers and Phillips talked with John Conner who was the person who left the cab at the time the person (whose description fit that of appellant) entered the cab. With the description and information furnished by Conner, the officers went to the Y. M. C. A., where they at 11:10 a. m., March 9, saw three males coming from a room. One of the three fit the description given by Conner to the officers. The officers told the three males that they were wanted at the City Hall with reference to the missing cab driver. They arrived the City Hall at 11:30 a. m. The two males with the appellant gave their names to the officers as Gregory G. LeGault and Pete Thompson.

The medical examiner, who performed the autopsy on the body of the deceased, testified that his death was caused by gunshot wounds in the aorta and liver.

Proof was made that a person signing his name to an affidavit as Gregory G. LeGault purchased a .22 caliber pistol from a gunshop about 5 p. m., March 8, 1968. While testifying, the seller identified Randle Hall as the person who bought the pistol. Hall was also identified as one of the three males Officer Powers and Phillips saw at the Y. M. C. A.

Detective Sinclair first saw the appellant shortly after 11 a. m. in the custody of Officers Phillips and Powers at the City Hall. Sinclair took the appellant before Judge Mace who warned him of his rights, and the appellant, Mace, and Officer Lawson signed the instrument containing the warning which bears the time and date of 11:30 a. m., March 9, 1968. In a brief time Detective Lawson gave the appellant a warning as to his rights which is shown in the record and it was in accordance with the requirements of Miranda. Officer Sinclair testified as follows:

"Q Mr. Sinclair, as a result of the conversation you had with this Defendant, did you have occasion to go somewhere?

"A I did, sir.

"Q And where did you go?

"A I went to a place located behind Harbison-Fischer, which is located at the east end of the 1700 block of Presidio.

"Q All right. Now when you arrived there, did you find anything?

"A I did, sir.

"Q And what was that, sir?

"A A body.

"Q And prior to the time of the conversation with this Defendant, did you know where this body was?

"A No, sir.

"Q After having viewed this body, did you have an occasion to go yet another place?

"A I did, sir.

"Q Where was that, sir?

"A To McDonald YMCA located in the 1600 block of Jones, I believe.

"Q Did you proceed to that location?

"A I did, sir.

"Q Where did you go therein?

"A I went to room 35 at McDonald YMCA.

"Q Could you state whether or not you found anything in that particular room?

"A I did, sir.

"Q What was that, sir?.

"A A 22 caliber pistol and three empty cartridge cases.

"Q Prior to the conversation you had with the Defendant, Dean Buchanan, did you know where this pistol and these three cartridge cases were?

"A No, sir.

"Q So all of this information was found strictly from your conversation with this Defendant?

"A Yes, sir.

\* \* \* \* \* \*

"Q What was the conversation that you had with this Defendant following the warning by Detective Hudson?

"A (No response.)

"Q What did you—did you ask him and what did he tell you?

"A He was asked about the taxicab driver and he first stated that the last time he had seen him was behind Harbison-Fischer, and that he had shot him three times with the 22 caliber pistol.

"Q All right. What else did he have to say at that time?

"A He agreed to show us where the body was located, or where he had last seen the body.

"Q Did he tell you how he shot the cab driver?

"A He stated that he got the money from the cab driver and then, or got his money from him and then he shot him three times, and I believe he said in the stomach, now.

"Q Did he tell you how much money he got from him?

"A Approximately $30.

"Q And I believe, then, you said he told you that he would take you to where the body was?

"A Yes, sir.

"Q Now did he lead you there or how did you get there?

"A He told us to go to the, where the car barns were located, and he would direct us from there.

"Q Now what did he say when he got to where the body was?

"A He pointed it out. He said, 'There it is over there,' and pointed to where the body was found.

"Q Was the body identified to you?

"A Yes, sir.

"Q What was the name of this body?

"A Austin R. Greer.

"Q What further conversation were you having with this Defendant at this time?

"A After arriving at the scene of the body, none.

"Q Did he mention to you prior to arriving at the scene of the body where the gun was?

"A It was mentioned to us at the scene after the body had been examined by myself and other officers.

"Q What did he tell you about the gun?

"A He told us that he had carried the gun to the McDonald YMCA and that he had given it to LeGault and had seen LeGault put it in a duffle bag in room 35.

"Q Then did Dean Buchanan lead you to this room and this duffle bag?

"A Yes, sir.

"Q And who pointed out the duffle bag to you?

"A The Defendant, Dean Buchanan.

"Q And did you, in fact, recover the gun there under his direction?

"A Yes, sir.

"Q What conversation did you have about the shells?

"A He was asked what he did with the empty cartridge cases and he said that he had threw them upon a shelf in the closet.

"Q Is this the same closet where the pistol was recovered?

"A Yes, sir.

"Q Then did you recover these items?

"A Yes, sir.

"Q Did he describe the gun to you as being any particular gun?

"A He said it was a 22 caliber revolver.

\* \* \* \* \* \*

"Q As a result of your investigation, do you know whether or not this Defendant was familiar with the area surrounding the Harbison-Fischer Company?

"A Yes, sir.

"Q In what respect was he familiar with it?

"A As he had worked at this company for two days.

\* \* \* \* \* \*

"Q Mr. Cook (Appellant's Counsel) has mentioned certain times, like he mentioned the possibility that some-one found the body at approximately 12:25. Do your notes reflect the time Dean Buchanan told you where the body was?

"A Yes, sir.

"Q And what time was that, please, sir?

"A 12:19 p. m., March 9, 1969.

"Q And in reference to the time Mr. Cook had been using for arrest time, 11:38, this is not a normal procedure, for a member of the Fort Worth Police Department to first take someone to get a warning before such time as they are officially registered into the jail?

"A Yes, sir."

Detective Sinclair testified further that he with the appellant was the first officer to appear at the scene of the body although unknown to him at the time the body had already been found by Van Reaves and reported to the police.

The appellant did not testify or offer any testimony at the guilt stage of the trial.

The evidence is sufficient to sustain the conviction.

In grounds of error numbers one, four and five, the appellant contends that the trial court erred in finding that he was legally arrested without a warrant, that he voluntarily waived his right to remain silent and to have counsel, and that it was error to permit Officer Sinclair to testify as to the oral statement of the appellant and the "fruits" obtained as a result of the statement.

To restate: In investigating the Yellow cab number 33, abandoned one block from the Y. M. C. A., with the whereabouts of its driver unknown, and some of his personal effects in the cab and a lead slug on the dash next to the windshield, the officers were led by the information on a trip sheet found in the cab to the passenger who left the cab on Peach Street about 12:25 a. m.,

**484**

and then to John Conner who had left the cab when the appellant entered as a passenger. With the description and information furnished by Conner the officers went to the Y. M. C. A. After a conversation with the clerk, the officers started to room 35. As they approached the room at 11:10 a. m., they saw three males leaving the room. One of the three fit the description given by Conner. The officers told the three males they were wanted at the City Hall with reference to the missing cab driver. They arrived at the City Hall at 11:30 a. m., and in a brief time the three males were arrested. By twelve o'clock the appellant had appeared before a magistrate who warned him of his rights and he had also been warned by Detective Lawson as to his rights.

A further summary of the facts is reflected in connection with the contention that the evidence is insufficient to support the conviction.

■ The court held a hearing in the absence of the jury on the admissibility of the oral statements in evidence. After having heard the evidence of both parties, the trial court found that the officer to whom the oral statements were made duly warned the appellant of his rights, reciting the warning that was given. He further found that the appellant was able to understand the warnings given and was capable of acting upon them; that the statements were freely and voluntarily made; and that in connection with said statements facts and circumstances were found to be true which conduced to establish his guilt, to-wit: the location of the body of the murder victim and the location of the pistol with which the murder was committed. The record supports the findings of the court. The issue of the voluntariness of the oral statement was not submitted to the jury and appellant never sought to have the issue submitted. Robinson v. State, Tex.Cr.App., 441 S.W.2d 855; Carter v. State, Tex.Cr.App., 445 S.W.2d 747.

Grounds of error numbers one, four and five are overruled.

The appellant submitted three requested charges to the effect that if the officers knew of the location of the body and the gun before appellant made his oral statement, the jury should not consider the testimony of Officer Sinclair as to the statement for any purpose and draw no inferences or conclusions therefrom.

■ The refusal of the requested charges was not error in that no issue of fact was raised by the evidence to require their submission. Davis v. State, Tex.Cr.App., 288 S.W.2d 499.

The judgment is affirmed.